1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  JOHN PAUL MICHA, M.D., an                 CASE NO. 09-CV-2753-JM (BGS)
    individual,
12                                            **ORDER REGARDING**
                                    Plaintiff, **MOTIONS TO DETERMINE**
13                                            **SCOPE OF REVIEW**
          v.
14                                            Doc. Nos. 34 & 35
    SUN LIFE ASSURANCE COMPANY
15  OF CANADA, a Delaware corporation;
    and GROUP DISABILITY BENEFITS
16  PLAN FOR GYNECOLOGIC
    ONCOLOGY ASSOCIATES
17  PARTNERS, LLC, a California limited
    liability company,
18
                                  Defendants.
19
    GROUP DISABILITY BENEFITS PLAN
20  FOR GYNECOLOGIC ONCOLOGY
    ASSOCIATES PARTNERS, LLC, a
21  California limited liability company,

22                          Cross-Complainant,

23        v.

24  SUN LIFE ASSURANCE COMPANY
    OF CANADA, a Delaware corporation,
25
                              Cross-Defendant.
26

27        Plaintiff John Paul Micha filed the instant lawsuit seeking review of Defendants'

28  decision to deny his claim for disability benefits. (Doc. No. 5, "Complaint.") Defendant Sun

Life Assurance Company of Canada ("Sun Life") now brings a motion requesting the court to determine the proper scope of its review. (Doc. No. 34.) Plaintiff has filed a cross-motion requesting the same, in which he is joined by Defendant and Cross-Claimant Group Disability Benefits Plan for Gynecologic Oncology Associates Partners, LLC ("Group Disability Plan"). (Doc. Nos. 35-42, collectively "Cross-Motion"; Doc. No. 50)

Pursuant to CivLR 7.1(d)(1), the court has determined that this matter is appropriate for resolution without oral argument. For the reasons set forth below, the court DENIES Sun Life's motion and GRANTS IN PART and DENIES IN PART Plaintiff's and Group Disability Plan's motion.

## I.   BACKGROUND

Plaintiff is a board-certified gynecologic oncology cancer surgeon employed by Gynecologic Oncology Associates Partners, LLC ("GOA") in Newport Beach, California. (Complaint ¶¶ 4 & 9.) GOA maintains a welfare benefit plan for its employees through Defendant/Cross-Claimant Group Disability Plan. (Id. ¶ 6.) On or around June 1, 2006, Group Disability Plan purchased an insurance policy (the "Policy") from Defendant Sun Life for purposes of funding its plan. (Id. ¶¶ 6 & 11; Doc. No. 14, "Cross-Claim," ¶ 149.) Prior to that, the plan had been covered by various other insurance providers. (Complaint ¶ 11.) The Group Disability Plan provides benefits to GOA employees deemed totally or partially disabled and "unable to perform the [m]aterial and [s]ubstantial [d]uties" of their specific occupation. (Id. ¶ 20-21.) Sun Life has the sole authority to determine whether claimants are eligible for these benefits. (Cross-Claim ¶ 150.)

### A.   Plaintiff's Medical History

On February 6, 2006, Plaintiff took a leave of absence from his work at GOA to undergo a total arthroplasty on his right hip at Hoag Memorial Hospital. (Complaint ¶ 34.) He was discharged for a two-month convalescent period, and returned to work on April 1, 2006. (Id. ¶¶ 34-35.) Although Plaintiff did not immediately resume his pre-surgery workload, he claims that he steadily increased the amount of work he took on in the subsequent months until he returned to his normal level of productivity in July 2006. (Id. ¶ 36.)

On July 22, 2006, Plaintiff suffered a sudden acute anterior wall myocardial infarction ("MI"). (Id. ¶ 39.) Plaintiff's regular cardiologist, Dr. Richard J. Haskell, performed an emergent angiography and angioplasty on Plaintiff with stenting to the left anterior descending artery times three to prevent further damage to the heart. (Id. ¶¶ 38-39.) Before discharging Plaintiff from the hospital, Dr. Haskell placed him on multiple medications, including a beta blocker, an ace inhibitor, a statin, and a platelet drug. (Id. ¶ 39.)

After his MI, Plaintiff began to experience a variety of symptoms, including shortness of breath, dizziness, muscle weakness, fatigue, chest pain, and nausea. (Id. ¶¶ 41-42.) He underwent a series of tests and evaluations, and some of his medications were discontinued and new medications substituted several times in an attempt to alleviate some of the problems. (Id. ¶¶ 41-45, 47 & 49.) Upon returning to work, Plaintiff was initially limited to performing office duties part-time without any surgeries. (Id. ¶ 46.) In August 2006, Plaintiff began seeing a psychiatrist, Dr. Robert Johnson, for treatment of the depression he was experiencing as a result of his inability to perform surgeries and the side effects from his medication. (Id. ¶ 48.) Beginning in October, Plaintiff once again began performing relatively easy surgeries, and by November was operating 30 hours per week (compared to his normal pre-MI level of 90 hours per week). (Id. ¶ 49.) However, he continued to complain of "significant fatigue and trouble focusing, muscle weakness, and dizziness" through December, particularly during longer surgeries. (Id. ¶ 49.)

On January 15, 2007, Plaintiff was performing a surgery when he was overcome by extreme dizziness and fatigue. (Id. ¶ 52.) Although he ultimately was able to complete the procedure, he immediately canceled the six other surgeries he had scheduled for that week. (Id.) Following the incident, GOA and Dr. Haskell determined that Plaintiff was no longer able to safely perform surgery, and Plaintiff was limited to seeing only nonsurgical patients thereafter. (Id. ¶ 53.) As a result of his reduced workload, Plaintiff's monthly earnings dropped significantly. (Id. ¶ 55.)

**B.      Plaintiff's Original Claim to Sun Life**

Shortly after the January 15 incident, Plaintiff submitted a long-term disability claim

to Sun Life, citing the symptoms of his disability, including "easily fatigued/severe fatigue, trouble focusing, muscle weakness, dizziness, chest pain and inability to multitask required during surgery." (Id. ¶ 57 (internal quotation marks omitted).) GOA and Dr. Haskell also submitted documents to Sun Life in connection with Plaintiff's claim. (Id. ¶ 58; Doc. No. 35-1 p. 6.) Specifically, Dr. Haskell completed an "Attending Physician Statement" ("APS") form provided by Sun Life in which he described Plaintiff's "[d]iagnosis and complications" as "[a]cute MI, fatigue, muscle weakness, [and] dizziness." (Complaint ¶ 58.) Dr. Haskell also speculated that these symptoms might be related to side effects from some of the medications Plaintiff was taking for his heart condition as well as possible depression. (Id. ¶¶ 59-62.)

In order to aid Sun Life's investigation of his claim, Plaintiff signed several release forms authorizing Sun Life to obtain any relevant medical, occupational, or earnings information from GOA, his physicians, and any other disability insurance companies that had provided Plaintiff with coverage during this time. (Id. at ¶ 64.) Plaintiff also participated in a 1.3-hour in-person interview with a representative from Archangel Investigations, an investigation service retained by Sun Life, on February 12, 2007, and submitted multiple financial documents, including quarterly profit and loss statements and tax returns, to Sun Life at its request. (Id. ¶¶ 66 & 69.) In addition, Plaintiff informed Sun Life on April 18, 2007 that two of his individual disability insurers had made findings of total disability and begun payments of full monthly disability benefits to Plaintiff under their policies with him. (Id. ¶ 71.) At no time during its review process did Sun Life request any additional examinations or testing to be performed on Plaintiff. (Id. ¶ 68.)

### C. Sun Life's First Denial of Plaintiff's Claim

On May 23, 2007, a Sun Life agent informed Plaintiff's wife telephonically that Sun Life was denying Plaintiff's claim "due to the contractual provisions as noted in the [Policy]." (Id. ¶ 72.) Plaintiff subsequently received a letter of denial from Sun Life dated May 31, 2007, in which Sun Life purportedly explained the basis for its decision. (Id. ¶ 75; Cross-Motion at Exh. E, hereafter "Claim File," pp. 1424-32, hereafter "Original Denial.") In it, Sun Life stated generally that Plaintiff did not qualify for long-term disability benefits under the Policy, and

went on to lay out its analysis in greater detail. (Id.) First, Sun Life indicated that it was "first notified of [Plaintiff's] claim for [long-term disability] benefits on January 23, 2007," despite the Policy term which requires that "written notice of claim must be given to Sun Life no later than 30 days before the end of the applicable Elimination Period"—January 18, 2007, in Plaintiff's case. (Original Denial at p.1.) The letter also went on to cite to several other provisions from the Policy, including the definitions of "total disability" and "partial disability," but did not explain the specific relevance of these provisions to the denial. (Id. at pp. 2-3.)

Sun Life then provided an overview of Plaintiff's "Claim History" and both a "Financial Review" and an "Occupational Review," summarizing its interpretation of the relevant facts in Plaintiff's case and the steps Sun Life took to review Plaintiff's claim. (Id. at pp. 3-6.) Included in this portion of the letter was the analysis of a vocational billing code reviewer asked by Sun Life to review Plaintiff's record of past procedures, who concluded that "[a]fter hip surgery in February 2006, [Plaintiff] never attained the level of productivity as a surgeon compared to 2005." (Id. at p.5.)

The letter then set forth the medical and psychiatric reviews of Plaintiff's condition conducted by Sun Life. (Id. at pp. 6-7.) Sun Life stated that it had forwarded Plaintiff's medical files to an orthopedist, a cardiologist, and a psychiatrist, each of whom provided his own medical opinion based on the information contained therein. (Id.) All three specialists concluded that there was no medical basis for Plaintiff's current inability to resume surgeries at his original pace and workload. (Id.) The orthopedist stated that Plaintiff's "treatment appears appropriate" with regard to his hip replacement surgery, and that there were "limited additional office notes reflecting any ongoing treatment . . . that would have precluded [Plaintiff] from returning to normal [work] capacity." (Id. at p.6.) The cardiologist opined that Plaintiff "has no evidence of any functional cardiac impairments," and that Plaintiff "has intact heart function and excellent functional capacity" such that Plaintiff should be able "to return to all of his usual pre-MI level of activity." (Id.) The cardiologist further concluded that "[t]he kinds of symptoms [Plaintiff] has are not likely due to his medicines," and that he "d[id] not

feel these symptoms are directly related to any cardiac impairment." (Id.) Finally, the psychiatrist found that Plaintiff's condition was merely an emotional response to his MI, and not based on any diagnosed psychiatric condition. (Id. at p.7.)

Sun Life concluded that Plaintiff was not eligible for either total or partial disability benefits under the Policy because "any loss of income appears to be as a result of a life-style choice to stop working for your Employer and not as a result of any restrictions and limitations that would prevent you from performing a sedentary occupation." (Id.) However, the letter also appeared to intimate that Plaintiff might be disabled as a result of his February 2006 hip surgery, stating that "there is insufficient objective evidence to that [sic] after your February 6, 2006 total hip replacement surgery that [sic] you recovered completely and continued to perform similar surgeries at the same capacity that you were performing prior to February 2006," and that "there was a significant change in your medical condition in February 2006 causing you the inability of [sic] regaining the same productivity level." (Id. at pp. 7-8.) Sun Life further suggested that Plaintiff's disability resulting from the February 2006 surgery might be covered under a prior carrier's plan, since Sun Life's coverage did not become effective until June 1, 2006. (Id. at p.7.) The letter ended with a notice of Plaintiff's right to appeal Sun Life's denial within 180 days. (Id. at p.8.) The notice also stated that Plaintiff could "submit written comments, document, records or other information relating to [his] claim for benefits" in support of his appeal, and that Plaintiff was entitled receive "free of charge copies of all documents, records, and other information relevant to [his] claim for benefits." (Id.) However, the notice did not specify what additional information Plaintiff could provide on appeal to perfect his claim.

### D.    Plaintiff's Appeal to Sun Life

On June 8, 2007, Plaintiff requested a copy of all documents in his file from Sun Life; however, the file that Sun Life sent back was incomplete, omitting certain records including the reports of the medical specialists retained by Sun Life. (Complaint ¶¶ 88-89.) Plaintiff nevertheless submitted his appeal on October 16, 2007. (Id. ¶ 92.) Included in his appeal were a letter from his colleague, Dr. Mark Rettenmaier, discussing the specific occupational

demands of gynecologic oncology surgeons and his own observations of Plaintiff's job performance following his MI; letters from Connie L. Birk, a registered nurse at GOA, and Plaintiff's wife, also describing their observations of Plaintiff's recent condition; a report from Plaintiff's neurologist Dr. Janet M. Chance, dated September 27, 2007, in which Dr. Chance diagnosed Plaintiff with vertigo and ordered a series of tests to determine its cause; and a second opinion report of another cardiologist, Dr. Marvin Appel, in which Dr. Appel explained the side effects of Plaintiff's medications and concluded that Plaintiff was "unfit to perform surgery." (Id.)

### E.     Sun Life's Final Denial of Plaintiff's Claim

As part of its review of Plaintiff's appeal, Sun Life sent requests for updated medical records to both Dr. Chance and Dr. Johnson. (Claim File at pp. 1490-91.) In addition, Sun Life forwarded Plaintiff's file to several new medical specialists for reassessment. (Complaint ¶ 98.) Sun Life thereafter issued a final decision confirming its original denial of Plaintiff's claim. (Id. ¶ 108.)

In a letter dated December 28, 2007, Sun Life explained that its decision was based on three medical and psychiatric reviews of Plaintiff's record. (Claim File at pp. 1541-46, hereafter "Final Denial.") First, Dr. Paul W. Sweeney, a cardiologist, examined Plaintiff's medical history and concluded that "[t]here is no direct cardiac cause of [Plaintiff's] current symptoms and perceived limitations." (Final Denial at p.2.) In Dr. Sweeney's opinion, Plaintiff's reported symptoms of "fatigue, dizziness, and lack of focus are not symptoms typically seen as a result of a small to moderate myocardial infarction"; rather, Dr. Sweeney speculated that they could "represent reactive depression or be in part secondary to medication." (Id. at pp. 2-3.) In particular, Dr. Sweeney suggested experimenting with alternative beta blockers and statins in order to determine if a better combination of medications was available for Plaintiff. (Id. at 3.) Second, Sun Life submitted Plaintiff's records to a neurologist, Dr. Alan Neuren, who concluded that "[t]here is no neurological basis for [Plaintiff's] complaints." (Id.) Instead, Dr. Neuren hypothesized that "[i]n all probability [Plaintiff's] somatic complaints are a manifestation of his emotional reaction to his heart

attack." (Id.) He added that Plaintiff's symptoms of "[f]atigue and difficulty concentrating are common manifestations of depression/anxiety or dysthymia." Finally, a psychiatrist, Dr. Mark Schroeder, also examined Plaintiff's records and concluded that they "did not demonstrate impairment likely due to a psychiatric disorder severe enough to lead to restrictions and limitations." (Id. at p.4.) Dr. Schroeder found that Plaintiff's file did not support a finding of dysthymic disorder, but rather was "potentially consistent with a diagnosis of adjustment disorder with depressed mood or depressive disorder NOS." (Id. at p.3.) However, because Dr. Johnson's records did not provide sufficient objective findings, as through "a detailed cognitive mental status examination or neuropsychological testing," it was difficult to ascertain Plaintiff's true level of functional impairment. (Id.) Although Dr. Schroeder also noted that "[n]europsychological testing with validity scales could be helpful in assessing potential cognitive impairment due to [cardiac] medication or other causes," he explicitly stated that he was "not specifically recommending that such testing be done." (Id. at p.5.)

Based on the updated reviews of Plaintiff's records conducted by Drs. Sweeney, Neuren, and Schroeder, Sun Life determined that it was "unable to identify any medical or psychiatric condition which would reasonable [*sic*] render [Plaintiff] unable to perform the Material and Substantial Duties of [his] Own Occupation" under the Policy. (Id.) The letter concluded by informing Plaintiff that "[a]ll administrative remedies have been exhausted," but that he "ha[d] the right to bring a civil action under the Employee Retirement Income Security Act of 1974 (ERISA), §502(a)." (Id.)

**F.    ERISA Action**

On December 9, 2009, Plaintiff commenced the instant action against Defendants Group Disability Plan and Sun Life, seeking to recover unpaid disability benefits and enforce his right to future benefits under the Policy pursuant to 29 U.S.C. § 1132(a)(1)(B). (Doc. No. 5.) In its response to Plaintiff's complaint, Group Disability Plan filed an answer admitting substantially all of Plaintiff's allegations, along with a cross-claim against Sun Life for a declaration of comparative fault and indemnification. (Doc. No. 14.)

Sun Life now brings a motion requesting that the court issue an order restricting the

scope of its review to the administrative record in this case. (Doc. No. 34.) Plaintiff in turn brings a cross-motion requesting an order admitting certain items of evidence not in the underlying administrative record. (Doc. No. 35.) Group Disability Plan has filed a joinder to Plaintiff's cross-motion. (Doc. No. 50.)

## II.   LEGAL STANDARD

The Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, was enacted by Congress to protect the interests of both participants in employee benefit plans as well as their beneficiaries "by setting out substantive regulatory requirements for employee benefit plans and . . . 'provid[ing] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004) (quoting 29 U.S.C. § 1001(b)). To this end, the Act has been described as serving "competing congressional purposes": on the one hand, Congress sought "to offer employees enhanced protection for their benefits"; on the other, it also wished to avoid "creat[ing] a system . . . so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." Varity Corp. v. Howe, 516 U.S. 489, 497 (1996).

29 U.S.C. § 1132(a)(1)(B) empowers an employee benefit plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

In 1995, the Ninth Circuit addressed the question of whether a district court can consider evidence outside of the administrative record upon *de novo* review of a plan administrator's decision. Mongeluzo v. Baxtor Travenol Disability Benefit Plan, 46 F.3d 938 (9th Cir. 1995). The Mongeluzo Court decided to follow the approach adopted by several other circuits, holding that "new evidence ***may*** be considered ***under certain circumstances*** to enable

the full exercise of informed and independent judgment." Id. at 943 (emphasis added). The Court further noted that the decision to allow such evidence was within the district court's discretion; however, it also emphasized that

> [t]he district court should exercise its discretion . . . only when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate *de novo* review of the benefit decision. In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination.

Id. at 944 (quoting Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1025 (4th Cir. 1993)) (emphasis added). Thus, only under exceptional circumstances should consideration of extra-record evidence be permitted. The Mongeluzo Court went on to find that such circumstances *were* present in the situation before it because of an intervening Ninth Circuit decision that narrowed the definition of mental illness, thereby "chang[ing] the legal posture of [the] case." Id. Because "the original hearing was conducted under a misconception of the law," the Court remanded the case to the district court to reconsider whether the plaintiff qualified for disability benefits given the new legal landscape.

More recently, the Ninth Circuit reaffirmed its reliance on the Fourth Circuit's Quesinberry opinion in a case challenging the district court's decision to admit extra-record evidence. There, the Ninth Circuit quoted with approval "a non-exhaustive list of exceptional circumstances where introduction of evidence beyond the administrative record could be considered necessary" set forth by the Quesinberry Court:

> [(1)] claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; [(2)] the availability of very limited administrative review procedures with little or no evidentiary record; [(3)] the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; [(4)] instances where the payor and the administrator are the same entity and the court is concerned about impartiality; [(5)] claims which would have been insurance contract claims prior to ERISA; and [(6)] circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

Opeta v. Nw. Airlines Pension Plan, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting Quesinberry, 987 F.2d at 1027). The Opeta Court ultimately concluded that the district court

had abused its discretion by admitting evidence outside of the administrative record in that case, in part because "none of the exceptional circumstances outlined in *Quesinberry* apply here." Id. at 1219.

### III.  DISCUSSION

Here, all parties concur that Sun Life's denial of benefits to Plaintiff is to be reviewed *de novo*. (Doc. No. 34-1 p.1; Doc. No. 35-1 p.17.)

According to Sun Life, Plaintiff's initial disclosures identify multiple pieces of evidence, including "thousands of pages of documents,"[1] that fall outside of the administrative record but that Plaintiff intends to introduce for the court's consideration. (Doc. No. 34-1 p.6.) Sun Life argues that this evidence is barred because courts may only consider the evidence that was actually before the administrator—that is, the administrative record—when reviewing a claim denial under ERISA. (Id. at pp. 7-8.) Although Sun Life concedes that there are certain exceptions to this general rule, it argues that these exceptions are quite narrow and have not been shown to apply to the circumstances of the instant case. (Id. at pp. 8-9.) While Plaintiff admits that many of the items of evidence listed in his disclosures are not a part of the administrative record, he nevertheless contends that each falls within one or more established exceptions to the rule prohibiting extra-record evidence. (Doc. No. 35-1 pp. 9-10.)

The court must therefore determine whether, at this stage, Plaintiff has demonstrated that the circumstances of his case are sufficiently "exceptional" such that the additional evidence he seeks to admit would be "necessary" to this court's review of Sun Life's denial.

### A.    Quesinberry Exceptions

Plaintiff's central complaint appears to be that Sun Life engaged in a pattern of conduct designed to permit the company to avoid learning certain details about Plaintiff's condition that would require it to find him disabled under the Policy. Indeed, a review of the record finds ample evidence to support this contention.

//

---

[1] Plaintiff objects that he produced only 622 pages of additional documents, and not "thousands of pages" as Sun Life contends. (Doc. No. 49 p.14.)

1            **1)      Initial investigation of Plaintiff's claim**

2          Sun Life conducted a minimal investigation into Plaintiff's medical condition after first

3    receiving his claim. None of Sun Life's reviewing physicians performed their own physical

4    examinations of Plaintiff; rather, all three limited themselves to "paper reviews," examining

5    only the medical records and treatment notes obtained from Dr. Haskell and Dr. Johnson. This

6    in and of itself may be indicative of an attempt by an insurance company to avoid paying out

7    on a legitimate claim. See Salomaa v. Honda Long Term Disability Plan, No. 08-55426, 2011

8    WL 768070 at *8 (9th Cir. Mar. 7, 2011) ("An insurance company may choose to avoid an

9    independent medical examination because of the risk that the physicians it employs may

10   conclude that the claimant is entitled to benefits. The skepticism we are required to apply

11   because of the plan's conflict of interests requires us to consider the possibility in this case.").

12   Moreover, the factual basis for the resulting analyses was questionable at best. For example,

13   Dr. J. Michael Gaziano, the cardiologist retained by Sun Life, opined that Plaintiff's cardiac

14   treatment "should permit [him] to return to all of his usual pre-MI level of activity" (Claim File

15   at p.1354), but based this conclusion in part on generalizations about the typical rate and

16   degree of recovery in the average MI patient. Specifically, Dr. Gaziano observed in his

17   analysis that "[m]any patients who have had a myocardial infarction and who have a good

18   ejection fraction can lead very active lives and can safely engage in vigorous activity," and that

19   although "[s]ome patients develop[] mild fatigue due to beta blockers," it "generally manifests

20   itself as [a] slight decrease in exertional capacity" and therefore "is not debilitating." (Id. at

21   p.1353.) However, knowing the extent of recovery observed in an *average* patient and the

22   reaction *typically* produced by a medication is insufficient to determine, *in a particular case*,

23   whether a patient was able to return to his pre-MI level of activity or whether a medication was

24   causing extreme and debilitating side effects, as Plaintiff claimed was the case here.

25          Similarly, the conclusion of Dr. Richard D. Corzatt, Sun Life's reviewing orthopedist,

26   that Plaintiff "did quite well postoperatively [following his hip replacement surgery] and was

27   gradually returning to a full surgical workload" (id. at p.1331) appears to have no real

28   foundation in the records provided. Earlier in the same report, Dr. Corzatt admits that "[t]he

last orthopedic note in the file was a Discharge Summary dated 2/7/06, the day after surgery."
(Id. at p.1330.) The only other source of data relied on by Dr. Corzatt is a note made by Sun
Life's benefits consultant, John B. Graff, documenting a phone conversation in which it was
mentioned that Plaintiff "returned to work on 4/1/06 and over the course of the next few
months was gradually working back to his prior duties of February 2006." (Id.) Based on these
two facts, Dr. Corzatt concluded that "***[i]t is presumed the claimant had a good result*** because
he returned to work eight weeks post-op on 4/1/06. . . . Total hip replacements normally
require 3-6 months of rehab and recovery. MMI [maximum medical improvement] is usually
reached in 9-12 months. ***Presumably Dr. Micha had reached MMI.***" (Id. (emphasis added).)
Thus, by his own admission, Dr. Corzatt's failure to find an orthopedic basis for Plaintiff's
disability was based largely on assumption, due to a lack of any relevant information or data
in the records provided to him by Sun Life.[2] Sun Life itself made reference in its Original
Denial to the "limited additional office notes" detailing the progress of Plaintiff's recovery
from the hip replacement surgery (Original Denial at p.6), yet made no apparent effort to
obtain the missing information from another source or have its reviewing orthopedist conduct
an independent exam.

Further, to the extent that Sun Life's reviewers came to conclusions directly contrary
to those of Plaintiff's treating physicians, they failed to explain why their opinions might differ
despite being based on the exact same information. For example, in his APS, Dr. Haskell
stated:

> [Plaintiff] is at high risk of having another MI. He should do everything he can
> to reduce that risk. . . . The long cancer surgeries he has performed are extremely
> stressful. 16 hour work days, long trips to multiple hospitals, and dealing with
> ill cancer patients[] and their families all added up to an unbelievably stressful,
> but productive, professional career for [Plaintiff]. ***From a personal cardiac***
> ***standpoint I advise that he stop doing surgery.*** However he loves being a
> physician and surgeon. He has chosen to continue his practice and do surgeries
> as much as he can tolerate. ***We both agree that he cannot work the 90 hour***
> ***weeks he was working, and should limit his exposure to the high risk stressful***
> ***surgeries and stressful patients.***

_____

[2] Although Plaintiff is not relying on his hip replacement surgery as the basis for his
current claimed disability, Dr. Corzatt's report is nevertheless indicative of the cursory nature
of the medical investigation conducted by Sun Life.

> [Plaintiff] needs to adjust to his new limitations and ***cut back his surgical and office volume*** due to easy fatigueability [*sic*], for his health and in order to optimally care for the more limited number of patients he can care for.

(<u>Id.</u> at p.59 (emphasis added).) However, in his own report, Dr. Gaziano does not make any reference to the specific demands of Plaintiff's job, and fails to explain why he believes Plaintiff will be able to handle the high levels of stress demanded by his particular occupation or why he believes Dr. Haskell's conclusion is incorrect.

In addition, although several of Sun Life's reviewing physicians indicated that additional testing or information might be helpful in shedding light on the cause of Plaintiff's alleged symptoms, Sun Life did not request that Plaintiff undergo any such tests or provide the missing data. Dr. Gaziano remarked that it "m[ight] be worth some further evaluation" to determine whether Plaintiff's anxiety medication or depression were contributing to his symptoms. (<u>Id.</u> at p.1535.) Dr. Victor Himber, Sun Life's reviewing psychiatrist, went further, noting that Plaintiff's symptoms "consist primarily of his self-reports. Although likely accurate, this information is not 'objective,' [and] the [symptoms] that can be assessed objectively with such instruments as standardized mood rating scales, tests for attention and concentration, etc., were not." (<u>Id.</u> at p.1342.) Yet, Sun Life made no effort to further explore these issues before issuing its Original Denial.

### 2) Original Denial

Several problems can also be identified in the Original Denial itself. First, the actual content of the denial letter appears internally inconsistent. Specifically, with regard to Plaintiff's hip surgery, Sun Life cites to Dr. Corzatt's report (described <u>supra</u>) and notes that there were "limited additional office notes reflecting any ongoing treatment as stated by your physicians that would have precluded you from returning to normal capacity with respect to the duties you performed prior to your total hip replacement." (Original Denial at p.6.) In setting forth its reasons for denial, however, Sun Life seems to imply the reverse:

> [T]here is insufficient objective evidence to that [*sic*] after your February 6, 2006 total hip replacement surgery that [*sic*] you recovered completely and continued to perform similar surgeries at the same capacity that you were

1    performing prior to February 2006 . . . . Based on the submitted documentation,
2    your occupational duties of a Gynecologic Cancer Surgeon changed in
     February 2006 as a result of your right total hip replacement surgery compared
3    to the months leading up to July 2006.

4    . . .

5    Therefore, we are unable to substantiate an ongoing total disability or partial
     disability claim with respect to your claimed conditions from July 22, 2006 and
6    forward . . . . since there was a significant change in your medical condition in
     February 2006 causing you the inability of [*sic*] regaining the same productivity
7    level of a Gynecologic Cancer Surgeon at the time of claim.

8    (Id. at p.7.)

9         Second, as Plaintiff correctly notes, Sun Life failed to provide "[a] description of any

10   additional material or information necessary for the claimant to perfect the claim and an

11   explanation of why such material or information is necessary" in the Original Denial, as

12   required under the regulations implementing ERISA.[3] 29 C.F.R. § 2560.503-1(g)(iii). As a

13   result, Plaintiff filed his appeal without knowing what additional information to include in

14   order to address the deficiencies in his original claim.

15        Furthermore, the Original Denial was somewhat ambiguous as to Sun Life's actual

16   reason for denying Plaintiff's claim. At the outset, the denial letter spends a considerable

17   amount of time documenting the fact that Plaintiff's claim was untimely (Original Denial at

18   pp. 1-2); however, this fact is not mentioned later in the summary of Sun Life's decision, so

19   it is unclear what role the alleged Policy violation played in the denial. In the actual portion

20   of the letter marked "Decision," Sun Life initially states that Plaintiff's loss of income "appears

21   to be as a result of a life-style choice to stop working for [his] Employer, and not as a result

22   of any restrictions and limitations that would prevent [him] from performing a sedentary

23   occupation." (Id. at p.7.) However, it then goes on to describe Plaintiff's "inability [to]

24   regain[]" his former productivity level as being the result of his February 2006 hip surgery. (Id.

25   at p.8.) In addition to potentially violating 29 C.F.R. § 2560.503-1(g)(1)(i)—which requires

26   an ERISA plan to "set forth, in a manner calculated to be understood by the claimant . . . [t]he

27   _____

28        [3] The terms of the Policy itself impose the same requirement. (See Doc. No. 35 Exh. A
     at p.30.)

specific reason or reasons for the adverse determination"—the confusion engendered by Sun Life's reasoning may have further impeded Plaintiff's ability to effectively appeal Sun Life's decision.

Finally, Sun Life's conclusion that Plaintiff reduced his work hours voluntarily as part of a "life-style choice" is highly suspicious, as it is repeatedly and strenuously contradicted by the reports of Plaintiff's treating physicians, and Sun Life makes no attempt to reconcile its finding with those reports. For example, Dr. Haskell states unequivocally in his APS that, although he advised Plaintiff to cease performing surgeries altogether, Plaintiff "loves being a physician and surgeon. He has chosen to continue his practice and do surgeries as much as he can tolerate." (Claim File at p.59.) Similarly, Dr. Johnson found that Plaintiff was having difficulty "adjust[ing] to the reality of the new limitations he has experienced since his myocardial infarction and triple coronary stent placement. . . . He loves being a physician and loves his patients. He would prefer to work to his maximum capacity, despite risks to his own health." (Id. at pp. 1301-02.) Although Sun Life is certainly not required to automatically accept the findings of Plaintiff's treating physicians, neither may it discount them without explanation and without credible evidence to the contrary. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, *may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician*. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit *reliable evidence that conflicts with a treating physician's evaluation*." (emphasis added)).

### 3)    Plaintiff's appeal

Problems similar to those identified above in the initial claim review can also be found in a review of the appeal process. As in the initial investigation process, Sun Life submitted Plaintiff's medical records to three physicians to conduct a "paper review" without ordering any independent medical examinations. In addition, Dr. Mark Schroeder, Sun Life's reviewing psychologist, twice mentioned certain tests that "could be helpful in assessing potential

cognitive impairment due to [cardiac] medication or other causes," but no such tests were ordered by Sun Life.[4] (Claim File at pp. 1538-39.) Plaintiff also submitted as part of his appeal letters from two new treating physicians—Dr. Appel and Dr. Chance—both of whom concurred that Plaintiff was "permanent[ly] . . . unfit to perform surgery." (Claim File at p.1483; see also id. at p.1486 ("Given the worsening of [Plaintiff's] symptoms, I do not foresee his being able to resume a surgical practice in the future.:).) As in the initial claim review, none of Sun Life's second-round paper reviewers explained why their diagnoses differed so dramatically from those of the physicians who had personally examined Plaintiff.

In addition, there is cause for concern over several anomalies in the report of cardiologist Dr. Paul W. Sweeney, particularly with regard to his discussion of Plaintiff's cardiac medications. In addressing the issue, Dr. Sweeney acknowledges that Plaintiff's "symptoms of fatigue, dizziness, and lack of focus" may be a result of his cardiac medications. (Id. at p.1499.) However, he merely recommends that the medications be reduced in dosage or replaced with other medicines within the same category, and ultimately concludes that no work restrictions are necessary. (Id. at pp. 1499-50.) This approach does not take into account the numerous trials on other medications already attempted by Dr. Haskell, as reflected in Plaintiff's medical records. (See, e.g., Complaint ¶¶ 44, 47, 49 & 56; Claim File at p. 1498.) These substitutions were ordered in an ultimately unsuccessful attempt to eliminate the debilitating side effects that Plaintiff complained of. Dr. Sweeney's approach also fails to discuss whether the medications he recommends discontinuing or replacing, including the beta blocker Toprol[5] and the statin agent Lipitor, are necessary to the maintenance of Plaintiff's health. Dr. Haskell's position, as documented in the records provided to Dr. Sweeney, was that

---

[4] Dr. Schroeder also explicitly stated that he was "not specifically recommending that such testing be done" (Claim File at p.1539); however, the information is nevertheless relevant in assessing whether Sun Life adequately investigated the potential medical causes for Plaintiff's condition before denying his appeal.

[5] It appears from both the Complaint and Dr. Sweeney's own synopsis of Plaintiff's medical history that Plaintiff had actually discontinued use of Toprol by the time that Dr. Sweeney's report was written. (Complaint ¶ 56; Claim File at p.1498.) Therefore, it is also unclear why Dr. Sweeney took the time to recommend reducing or eliminating Plaintiff's use of Toprol going forward.

it was medically necessary for Plaintiff to take both a beta blocker and a statin for the rest of his life. (Claim File at p.59; <u>see also</u> <u>id.</u> at p.1301.) Dr. Sweeney, in suggesting that Plaintiff cease his use of Toprol and Lipitor in order to eliminate the side effects, fails to address this aspect of the case; if he disagreed with this portion of Dr. Haskell's recommendation, he did not state so explicitly, nor did he explain why.

Finally, a careful reading of the Final Denial and the documents referenced therein reveals that Sun Life may have changed the basis for its denial on appeal, despite stating that its original decision to deny Plaintiff's claim was merely being "upheld." (<u>Id.</u> at p.1545.) As explained above, there were three possible reasons for Sun Life to reject Plaintiff's claim set forth in the Original Denial: first, because Plaintiff's filing was untimely; second, because Plaintiff's decision to work fewer hours was a "life-style choice"; and third, because Plaintiff was disabled as a result of his February 2006 hip surgery, not his July 2006 MI, and the condition was therefore not covered by the Policy. In the Final Denial, there is no mention of the first or third reasons, so, presumably, Sun Life was premising its denial on the second reason—namely, that Plaintiff voluntarily chose to work fewer hours. However, in Sun Life's second round of paper reviews, Dr. Schroeder explicitly stated that the records did *not* support a finding "that work avoidance was a cause of [Plaintiff's] leaving work." (Final Denial at p.5; Claim File at p.1539.) Therefore, Sun Life must have either rejected this finding by Dr. Schroeder—and failed to mention that it did so in the Final Denial letter—or found an alternative basis for denying Plaintiff's claim. Indeed, Sun Life does state that Plaintiff's "pre-disability work schedule was very demanding and after experiencing [his] myocardial infarction, [he] *may* have experienced a psychological reaction resulting in some symptoms of depression." (Final Denial at p.5 (emphasis added).) It then goes on to reiterate that, "[a]dditionally, [Plaintiff] my [*sic*] have made a choice to no longer continue such a demanding schedule due to the potential effects on [his] health." (<u>Id.</u>) However, to the extent that Sun Life is attempting to offer a new rationale for denying Plaintiff's claim on appeal, such a change of opinion in the context of affirming a denial on appeal is prohibited as a matter of law. <u>See</u> <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 974 (9th Cir. 2006) ("When an

1    administrator tacks on a new reason for denying benefits in a final decision, thereby precluding

2    the plan participant from responding to that rationale for denial at the administrative level, the

3    administrator violates ERISA's procedures.").

4        Thus, as this lengthy discussion demonstrates, there is sufficient evidence for the court

5    to conclude that, in Plaintiff's case, Sun Life's claims review procedure was inadequate,

6    calling into question the company's impartiality. See id. at 965-66 ("[A]n insurer that acts as

7    both the plan administrator and the funding source for benefits operates under what may be

8    termed a structural conflict of interest. On the one hand, such an administrator is responsible

9    for administering the plan so that those who deserve benefits receive them. On the other hand,

10   such an administrator has an incentive to pay as little in benefits as possible to plan participants

11   because the less money the insurer pays out, the more money it retains in its own coffers.").

12   There may also be reason to question the credibility of the medical experts that Sun Life

13   retained to review Plaintiff's records. As these fit the criteria for two of the Quesinberry

14   factors, the court may consider extra-record evidence where it finds it necessary to conduct an

15   independent *de novo* review of the claim denial.

16       **B.    Evidence**

17       Plaintiff has specifically proposed admitting into evidence twelve (12) groups of

18   documents that are outside of the administrative record. (Doc. No. 35-1 pp. 10-17.) These

19   documents were produced to Defendants on or around July 12, 2010. (Cross-Motion at Exh. D,

20   hereafter "Plaintiff's Disclosures.") Below, each type of document is analyzed in order to

21   determine whether it is "necessary" to this court's review at this time.

22       **1)    Table of monthly charges by each GOA surgeon in 2006**

23       Plaintiff has created a table summarizing the monthly charges generated by each GOA

24   surgeon in 2006 and offered it as evidence on the grounds that it "substantiates [Plaintiff's]

25   report to Sun Life that after his Jan. 2006 hip arthroplasty, his cancer surgeries increased each

26   month to a near-full level by end-May '06, and full level by June/July 2006." (Doc. No. 35-1

27   p.10.) This evidence is apparently intended to refute Sun Life's finding that Plaintiff "never

28   attained the level of productivity as a surgeon compared to 2005" following his hip

1    replacement.

2          To the extent that Plaintiff is asserting that Sun Life misread or incorrectly interpreted

3    the materials in the administrative record relating to his work productivity in the first half of

4    2006, a review of the record itself should be sufficient for the court to ascertain whether any

5    errors were made. Moreover, it is unclear why the information in the table is relevant to

6    assessing Plaintiff's work performance. Plaintiff emphasizes that his surgery charges for the

7    month of July 2006 exceeded those of two other GOA surgeons, Dr. Brown and Dr.

8    Rettenmaier (id.); however, there is nothing before the court to suggest what the relationship

9    between Plaintiff's monthly charges and those of his colleagues is, has historically been, or

10   was supposed to be. Furthermore, Plaintiff was made aware of Sun Life's allegedly erroneous

11   conclusion regarding his diminished work productivity upon receiving the Original Denial on

12   or around May 31, 2007. He therefore had the opportunity to provide this table (and explain

13   its relevance) during his appeal process, which he elected not to do.[6] See Kearney v. Standard

14   Ins. Co., 175 F.3d 1084, 1091 (9th Cir. 1999) (upholding the district court's decision to

15   exclude certain data not in the record because "if [the claimant] thought [the administrator]

16   should have reviewed it, he should have sent it to them").

17         Therefore, the court determines at present to EXCLUDE this evidence from its review.

18              **2)      Correspondence with other insurance companies**

19         Plaintiff also seeks to offer four (4) different letters from insurance carriers AXA

20   Equitable Life Insurance Company ("AXA Equitable"), Unum, and Standard Insurance

21   Company ("Standard") discussing or confirming approval of Plaintiff's long-term disability

22   insurance claims under their own separate policies. (Doc. No. 35-1 p.10; Plaintiff's Disclosures

23   at pp. 13-20, 50.) Plaintiff argues that this evidence should be admitted because Sun Life

24   "breached its fiduciary duty by failing to use [Plaintiff's] signed authorization forms to obtain"

25   this information. (Doc. No. 35-1 p.10.)

26   _____

27         [6] Although Plaintiff argues that Sun Life "never requested or suggested [that he] should
     submit comparative monthly data of his and the other GOA surgeons [sic] monthly charges"
     (Doc. No. 35-1 p.10 (emphasis omitted)), it is unclear why Sun Life *would* have requested this

28   information, let alone why it was obligated to do so. See supra for discussion of relevance of
     evidence.

There is some support for the contention that Sun Life's failure to acknowledge or discuss the contrary findings of other insurance companies might be relevant to a determination of "whether an adverse benefits determination was the product of a principled and deliberative reasoning process." Cf. Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009) (holding that insurance company's failure to "distinguish[] the [Social Security Administration's] contrary conclusion may indicate a failure to consider relevant evidence"); Salomaa, 2011 WL 768070 at *11 ("Social Security disability awards do not bind plan administrators, but they are evidence of a disability. Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion." (internal footnotes omitted)). However, other insurers' determinations regarding Plaintiff's condition are not binding on Sun Life. More importantly, the documents Plaintiff offers into evidence provide little relevant information beyond confirming that the other insurers did in fact find Plaintiff to be disabled under their policies; the fact that Sun Life was aware of this is already adequately reflected in the record, as demonstrated in Plaintiff's April 18, 2007 letter. (Claim File at p.1360.) Therefore, there is no demonstrated need for this additional evidence, and the court will EXCLUDE it from the scope of its review at this time.

### 3) Letter from Dr. Rettenmaier re: AXA Equitable's buyout of Plaintiff's corporation's equity interest in GOA

Plaintiff also seeks to admit a letter from his colleague Dr. Rettenmaier dated June 28, 2010, confirming that insurer AXA Equitable purchased Plaintiff's equity interest in GOA pursuant to its disability buyout policy after finding Plaintiff "to be totally disabled as a cancer surgeon." (Plaintiff's Disclosures at p.115; Doc. No. 35-1 at p.10.) As with the correspondence with the other insurers, the letter is intended to prove that Plaintiff was in fact considered disabled under a different policy. For the same reasons discussed above, this evidence is not necessary to the court's review at this time and will be EXCLUDED.

//

//

1

**4)**      **Monthly insurance forms submitted to AXA Equitable and Unum**

2    Plaintiff has produced copies of insurance forms submitted to AXA Equitable and

3 Unum between January 2007 and March 2010, confirming Plaintiff's ongoing disability and

4 Dr. Haskell's continued diagnosis of Plaintiff's condition. (Doc. No. 35-1 p.11; Plaintiff's

5 Disclosures at pp. 34-44, 80-81, 84-89, 91-109.) Plaintiff argues that the forms should be

6 admitted because they were documents Sun Life *could* have obtained using Plaintiff's signed

7 release, and that Sun Life was in fact *obligated* to obtain in conducting its review of Plaintiff's

8 claim. (Doc. No. 35-1 at p.11.) According to Plaintiff, the documents predating Sun Life's

9 Final Denial are "necessary" because they provide "missing details about Dr. Micha's

10 dizziness/vertigo," while the forms that postdate the Final Denial "provide the Court with some

11 of the only available information confirming [Plaintiff's] continuing disability into 2010." (Id.)

12    It is not clear that Sun Life was necessarily obligated to obtain these forms in the course

13 of its initial review process, although, as noted above, there may be case law to support the

14 contention that the decisions of other insurers were relevant to Sun Life's ultimate

15 determination. However, regardless of whether Sun Life's failure to request documents from

16 AXA Equitable and Unum was a violation of its duties as a fiduciary, Plaintiff has failed to

17 show that the forms are necessary to the court's review. With regard to the documents that

18 predate the Final Denial, the forms contain no information that was not also submitted to Sun

19 Life during its own claims process. For example, the APS submitted to AXA Equitable on or

20 around January 10, 2007 is virtually identical in content to the APS submitted to Sun Life on

21 or around January 17, 2007. (Compare Plaintiff's Disclosures at pp.107-09, with id. at

22 pp.54-60.) In addition, none of the subsequent forms submitted to AXA Equitable and Unum

23 contain any new information not found in the APS. (Id. at pp. 97-106.) As for the documents

24 postdating the Final Denial, evidence of whether Plaintiff's disability has been continuous to

25 the present is not necessary at this stage of the litigation to determine whether Sun Life's denial

26 of benefits was correct; if the court does ultimately find that Plaintiff *is* entitled to long-term

27 disability payments under the Policy, only then may issues of Plaintiff's ongoing condition be

28 considered for purposes of calculating the amount of Plaintiff's entitlement.

1    Therefore, the court will EXCLUDE this evidence from its review at this time.

2    **5)    Correspondence, medical records, and vestibular testing by Dr.**
3    **Shohet**

4    In early 2008, Plaintiff was referred by Dr. Chance to Dr. Jack A. Shohet, a vestibular

5    specialist, for further examination and testing in an attempt to determine the cause of his

6    vertigo. (Complaint ¶ 123.) Plaintiff made a number of visits to Dr. Shohet, including one on

7    April 1, 2008, to undergo vestibular testing. (Id.) Dr. Shohet found that Plaintiff's test results

8    were "significant for some objective findings of direction-changing positional nystagmus

9    without visual fixation," thought to "represent some central nervous system dysfunction such

10   as might be seen with cervical vertigo." (Id. (emphasis omitted).) Dr. Shohet concluded that

11   "[Plaintiff's] symptoms and limitations due to the central vertigo are incompatible with him

12   performing surgery." (Id.) Plaintiff now seeks to admit the results of Dr. Shohet's April 2008

13   examination as well as Dr. Shohet's other medical notes and correspondence as evidence

14   demonstrating a medical basis for Plaintiff's disability. (Doc. No. 35-1 pp. 11-15.) Plaintiff

15   argues that this evidence should be admitted because Sun Life failed to properly inquire into

16   Plaintiff's ongoing treatment during the course of its review, thereby denying Plaintiff the

17   opportunity to gather key evidence in support of his claim. (Id. at p.11) Specifically, Plaintiff

18   contends that Sun Life should have tolled its decision making process and requested that

19   Plaintiff continue to send it updated results until all suspected causes of Plaintiff's vertigo had

20   been tested. (Id.)

21   Notably, Plaintiff cites to the federal regulations implementing ERISA as proof that Sun

22   Life could have tolled the time limit for deciding Plaintiff's appeal in order to await further

23   testing. (Id.) However, this position overstates the degree of flexibility Sun Life had in

24   conducting its review process. Under 29 C.F.R. § 2560.503-1(i)(1)(i) & (3)(i),[7] Sun Life was

25   required to notify Plaintiff of the results of his request for review within 45 days of receiving

26   notice of appeal, unless Sun Life determined that "special circumstances . . . requir[ing] an

27

28   _____
     [7] Plaintiff mistakenly cites to 29 C.F.R. § 2560.503-1(f) in his moving papers, which
     deals with extensions of time for issuing the original benefits determination.

extension of time for processing the claim" were present; in that case, it could provide Plaintiff with written notice of the extension, provided that such extension did not continue beyond an additional 45 days from the end of the initial review period. Therefore, given that Plaintiff submitted his appeal on October 12, 2007, at best, Sun Life could have extended the time for its review out 90 days from that date, meaning that it would have been absolutely required to issue its decision on Plaintiff's appeal by January 10, 2008. As Plaintiff was only referred to Dr. Shohet beginning in February 2008, all of the documentation that he seeks to admit here post-dates this hypothetical deadline. (See Plaintiff's Disclosures at pp. 22-33, 82-83, 90, 238-57.)

There is an argument to be made that some of the information contained in Dr. Shohet's records and correspondence could have been discovered by Sun Life earlier had it satisfied its obligation to fully investigate Plaintiff's condition by, for example, ordering an independent medical examination to be conducted by one of its physicians. However, such an argument is purely speculative at this stage of the litigation. The court will be better equipped to decide the relevance of Dr. Shohet's analysis at a later time.

Plaintiff also argues that Dr. Shohet's diagnosis of benign primary paroxysmal vertigo is a "new diagnosis that was not available earlier," such that its admissibility follows directly under Mongeluzo. (Doc. No. 35-1 at p.21.) Plaintiff cites to a portion of the case in which the Ninth Circuit finds it proper to admit evidence that is "simply a new explanation for [the claimant's] disability." (Id. at p.21 n.32 (quoting Mongeluzo, 46 F.3d at 944).) However, this argument is premised on a misreading of the case. The Mongeluzo Court did not conclude that extra-record evidence could be admitted simply because it diagnosed a previously unidentified condition; indeed, the Court made it clear that "a district court should not take additional evidence *merely because someone at a later time comes up with new evidence* that was not presented to the plan administrator." Mongeluzo, 46 F.3d at 944 (emphasis added). Rather, the Court limited its holding to situations "where the original hearing was conducted under a *misconception of law*," as opposed to a misconception of fact. Id.

Therefore, because Plaintiff has failed to demonstrate that Dr. Shohet's records are

1    necessary to the court's review, this evidence will be EXCLUDED at this stage.

2              **6)      Correspondence and medical records of Dr. Haskell and Dr. Chance**

3            Plaintiff seeks to admit additional correspondence and medical records from his treating

4    physicians Dr. Haskell and Dr. Chance, some of which post-date the Final Denial. (Doc.

5    No. 35-1 p.11.) Plaintiff offers this evidence on the same theory applied to Dr. Shohet's

6    records, namely, that Sun Life could and should have requested this information and

7    incorporated it into its review process. (Id. at pp. 11-15.) Additionally, Plaintiff points out that,

8    on appeal, Sun Life requested updated records from only Dr. Johnson and Dr. Chance, but not

9    Dr. Haskell, such that the administrative record did not contain Dr. Haskell's most up-to-date

10   records at the time the Final Denial was issued. (Id. at p.213.)

11          For the same reasons described above, the court will EXCLUDE all records from

12   Plaintiff's treating physicians that post-date the Final Denial at this time. However, because

13   it was improper for Sun Life to refuse to consider Dr. Haskell's updated records on appeal, to

14   the extent that the documents offered contain records from Dr. Haskell that *pre-date* the Final

15   Denial (see, e.g., Plaintiff's Disclosures pp. 363-466), the court will ADMIT them for

16   consideration.

17             **7)      January 15, 2009 IME by Dr. Chaikin**

18          On January 15, 2009, cardiologist Dr. Michael L. Chaikin performed an independent

19   medical examination ("IME") on Plaintiff at the request of one of Plaintiff's other disability

20   insurers, AXA Equitable, and set forth his findings and diagnoses in a letter to AXA Equitable

21   Senior Claim Consultant Philip A. Verdi. (Plaintiff's Disclosures at pp. 51-60.) Based on his

22   own examination of Plaintiff as well as the copies Plaintiff's medical records provided,

23   Dr. Chaikin concluded that Plaintiff was "totally disabled from his occupation as a

24   gynecological oncologist." (Id. at p.59.) Plaintiff now requests the court include this letter as

25   part of its review of Sun Life's benefits denial decision, arguing that because Sun Life did not

26   order an IME itself, the one obtained by AXA Equitable should be substituted in its place.

27   (Doc. No. 35-1 p.15.)

28          The contrast between the detailed analysis of Dr. Chaikin's IME and the relatively

superficial reports of Sun Life's reviewing physicians provides some insight into what the administrative record *might* look like had Sun Life done a more thorough job investigating Plaintiff's claim. Therefore, the court finds it appropriate to ADMIT this evidence for consideration as part of its review, if only to underscore the qualitative difference between the results obtained from an IME as opposed to those from an analysis conducted solely on limited paper records.

### 8)   December 19, 2008 vocational analysis by Hall Associates

Sometime in or around December 2008, Hall Associates, a rehabilitation consulting company, was asked to prepare a vocational analysis regarding Plaintiff's occupation in support of Plaintiff's claim under his policy with AXA Equitable. (Plaintiff's Disclosures at pp. 64-78.) Plaintiff now seeks to admit the resulting Vocational Assessment & Summary Report Regarding John P. Micha, M.D. ("Vocational Assessment") in order to provide a more "accurate understanding of [Plaintiff's] occupation." (Doc. No. 35-1 p.15.) However, as Plaintiff admits, a description of the practice of gynecologic oncology was already provided to Sun Life both through the Archangel Investigations report as well as through documents submitted directly by Plaintiff. (Id.) Thus, Plaintiff's only argument for admitting the Vocational Assessment is that it *might* contain necessary information "[i]f this Court finds those descriptions insufficient." (Id.) There is no indication that such additional information as the Vocational Assessment contains is necessary at this stage; therefore, the court will EXCLUDE this evidence at this time.

### 9)   November 2009 neurosurgical consult report and C-Spine MRI studies by Dr. Kim

In November 2009, Plaintiff was referred to neurosurgeon Dr. Richard B. Kim for a cervical spine ("C-spine") MRI, which found "relatively mild age-related degenerative changes at several levels." (Plaintiff's Disclosures at pp. 45-49.) Plaintiff now argues that Dr. Kim's findings and records should be admitted because the C-spine MRI "objectively confirmed the long-suspected contribution by the cervical spine" to Plaintiff's vertigo first identified in Dr. Chance's September 27, 2007 letter. (Doc. No. 35-1 p.8; see also Claim File at pp.

1485-86.)

Plaintiff appears to argue that, based on the content of Dr. Chance's letter, Sun Life should have immediately known that ordering a C-spine MRI was the logical next step towards determining the cause of Plaintiff's vertigo, but instead purposefully withheld that information from Plaintiff. (See Doc. No. 35-1 p.16 ("Sun Life had the ability under the policy to order an IME and testing to resolve the issue if it wanted, but did not. Nor did it inform [Plaintiff] that a C-spine MRI would be helpful.").) However, this position is undermined by the fact that the C-spine MRI was not ordered by Plaintiff's own treating physicians until late 2009—more than two years after Plaintiff consulted with Dr. Chance. Indeed, Dr. Chance herself mentioned she would be conducting a "cervical spine series" on Plaintiff (Claim File at p.1485), but this series apparently did not include the C-spine MRI Plaintiff now claims Sun Life should have ordered on its own in late 2007. Thus, although Sun Life may have made some mistakes in its investigation of Plaintiff's claim, based on the evidence currently before the court, its failure to order a C-spine MRI was not one of them. Therefore, the court will EXCLUDE this evidence from the record at present.

### 10)    Physician's Desk Reference excerpts

Plaintiff has produced several excerpts from the Physician's Desk Reference listing the common adverse reactions found in patients taking the cardiac medications he was prescribed following his MI. (Plaintiff's Disclosures at pp. 110-14.) He now argues that this information should be admitted as "general medical information of which courts may take judicial notice." (Doc. No. 35-1 at p.16.) However, Plaintiff also admits that "Sun Life has essentially concurred with the side effects of these medications," and that the information in the excerpts is therefore only a "better" version of what is already in the Claim File. (Id.) Therefore, by Plaintiff's own admission, this information is not "necessary" to the court's review and will be EXCLUDED.

//

//

//

**11)    Plaintiff's 2007-2009 corporate income and joint-filed individual tax returns**

Although Sun Life already requested and received copies of Plaintiff's historical income tax returns in conducting its review, Plaintiff now seeks to introduce evidence of returns in subsequent years in order to confirm the reduction in his earnings level following his MI. (Id. at p.16.) However, Plaintiff fails to explain why the income information already in the Claim File is inaccurate or misleading, and why the returns he offers now are necessary to the court's review. Therefore, the court will EXCLUDE this evidence at this time.

**12)    Correspondence from Plaintiff's CPA**

Finally, Plaintiff has provided copies of certain correspondence from Plaintiff's CPA, Gregory N. Lewis, dating from June 2010, in which Mr. Lewis confirms that Plaintiff did not deduct the premium payments on his insurance policies for income tax purposes, and lists the amounts of Plaintiff's 2004-09 pension contributions. (Plaintiff's Disclosures at pp. 12, 15, 120.) It is unclear how this information is relevant to the court's review of Plaintiff's case. Although Plaintiff appears to argue that these documents also prove something about the decrease in his earnings as a result of his disability, they do not appear to do so and more importantly, as discussed above, it has not been proven that the information in the Claim File in inadequate in this regard. Therefore, the court also finds it appropriate to EXCLUDE this evidence at this time.

**C.    Timing and Procedure for Admission of Extra-Record Evidence**

In addition to denying the objective admissibility of Plaintiff's proffered evidence, Sun Life also argues that Plaintiff's attempt to introduce extra-record evidence at this stage of the litigation is improper because it violates the established procedure for admission. (Doc. No. 34-1 p.14.) According to Sun Life, that procedure is as follows:

> First, the **_issues_** requiring extra-record evidence, if any, must be **discretely identified** by the parties in their briefing on the administrative record. The party proposing to introduce the evidence must explain why it meets the standards outlined by the Ninth Circuit in *Mongeluzo*. Second, the Court must determine, after a full review of the administrative record, that additional evidence will clarify the issues raised in the administrative record.

(Id. (original emphasis).) Because the court has yet to conduct a full review of the

1    administrative record, Sun Life argues, it is not yet able to rule on the need to admit additional

2    evidence. (Id. at p.15.)

3        Sun Life incorrectly asserts that this specific procedure is mandated as a matter of law.

4    Although it cites to several Ninth Circuit cases that allegedly support this proposition (Doc.

5    No. 48 at pp. 8-9), those cases merely hold that a district court does not abuse its discretion

6    when it admits additional evidence after reviewing the administrative record; they do not

7    establish a strict sequence of events that the court must follow in all cases. Nevertheless, as a

8    *practical* matter, the procedure Sun Life recommends is the more efficient and effective one.

9    As the discussion of the individual items of evidence above demonstrates, it is extremely

10   difficult to determine at the outset of a case what information will be "necessary" in order for

11   a court to conduct a *de novo* review of a benefits decision.

12       Thus, although the court has decided to exclude almost all of the evidence offered by

13   Plaintiff at this time, it nevertheless reserves the right to admit the excluded evidence at a later

14   date should it become apparent that the information provided therein is necessary to its

15   decision.[8]

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28
_____

[8]   Sun Life has explicitly conceded that Plaintiff's extra-record evidence may be
properly admitted at a later stage. (Doc. No. 34-1 p.15.)

**IV.    CONCLUSION**

For the foregoing reasons, the court hereby DENIES Sun Life's motion to determine the scope of review (Doc. No. 34), and GRANTS IN PART and DENIES IN PART Plaintiff's cross-motion (Doc. No. 35). However, in granting in part Plaintiff's motion, the court admits only a very limited portion of the evidence offered—namely the records of Dr. Haskell pre-dating the Final Denial that were not sought by Sun Life as part of its appeal process and the January 2009 IME by Dr. Chaiken. All other evidence is to be excluded for the time being, although the court may later find it necessary to admit some or all of it in conducting its *de novo* review.

**IT IS SO ORDERED.**

DATED:  May 2, 2011

_____
Hon. Jeffrey T. Miller
United States District Judge